# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

JERRY S. KESSLER and
JARRELL'S EXXON,

                Plaintiffs,

v.                                        CIVIL ACTION NO.  5:16-cv-06067

FIRST COMMUNITY BANK and
FIRST COMMUNITY BANCSHARES, INC.,

                Defendants.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Defendants' Motion for Summary Judgment* (Document 99), the supporting memorandum (Document 100), the *Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment* (Document 104),[1] and the *Defendants' Reply to Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment* (Document 109). The Court has also reviewed all attached exhibits. For the reasons stated herein, the Court finds that the motion should be granted in part and denied in part.

## FACTS

The Plaintiffs in this matter are Jerry Kessler and Jarrell's Exxon. Jerry Kessler is the sole owner of Jarrell's Exxon, a gas and service station in Hinton, West Virginia. He took the business over from his father, Billy Joe Kessler (Joe), in 2008. Joe Kessler began working at Jarrell's as a

---

[1] The Defendant moves for the Plaintiffs' response to be stricken as untimely because it was filed fifteen (15) days after the motion, while the local rules require responses within fourteen (14) days. The Court finds that striking the response is not an appropriate sanction for the asserted untimeliness under the circumstances.

college student, and soon took on a management role, which he maintained even after completing college and taking a full-time job for the county board of education. The original owners left the station to Joe Kessler in 1994, after they both passed away. Jarrell's Exxon is a full-service gas station and garage. It employees two gas attendants and two mechanics, as well as Jerry Kessler. Joe Kessler continues to assist with bookkeeping, management, and customer service at least one day per week, although he does not draw a salary.

The Kesslers report that gas sales had been declining somewhat in 2012 and 2013, but the station's profits were up by 11% in the first half of 2015. Gas profits tend to fluctuate, and more than half of the station's profits come from the garage, which does vehicle maintenance and repair and also sells tires. Jarrell's is one of four gas stations in Hinton, although the fourth, a Kroger fuel station, opened several months after the events at issue in this suit. It is the only full-service gas station in town. During the hours the station is open, an attendant will pump gas, clean customers' windshields, top off fluids, and check air pressure in tires. The gas pumps remain open for customers to purchase gas with a credit card during nights and weekends, when the station is unattended. The Kesslers both testified that the station had enjoyed a strong reputation in the community and a loyal customer base, which they attribute to decades of good customer service.

The Defendant, First Community Bank, is one of three banks in Hinton. At the end of July 2015, bank employees began receiving an unusually high number of customer complaints of unauthorized transactions posting on accounts associated with debit cards. First Community Bank's procedure for handling such complaints is to deactivate the card, review the account with the customer to identify all unauthorized transactions, have the customer call the merchants associated with the transactions to seek refunds, encourage the customer to file a police report, and

2

have the customer complete a "Reg E" form. The Reg E form details the unauthorized transaction. Branch employees then send the Reg E form to the bank's Electronic Funds Transfer (EFT) department, which credits the customer's account in the amount of the fraudulent transactions and issues a new card. In some cases, the EFT department flags transactions that appear inconsistent with the customer's usual card usage, and essentially the same steps are taken.

First Community Bank has no official policy regarding whether and how to investigate the source of bankcard fraud, beyond the actions intended to reimburse consumers and reissue cards. Some of the tellers at the Hinton branch stated that they recalled a computer training session that explained how to review impacted customer accounts to search for a merchant patronized by all of the customers within a certain time frame to find a common denominator that could be the source of the fraud. The corporate employees indicated that there was no policy either requiring or prohibiting employees from undertaking such an investigation.

The Hinton branch manager was on vacation in the summer of 2015 when the bank experienced an influx of fraud reports. The bank tellers decided to conduct an investigation to determine the source of the fraud. The documentation of that investigation was destroyed, and the details are a bit hazy. However, deposition testimony indicates that they reviewed account activity for the past several weeks for at least ten accounts. They determined that Jarrell's Exxon was a common denominator, although testimony is inconsistent with respect to whether all reviewed accounts had transactions at Jarrell's, or only 75-90% of accounts had transactions at Jarrell's. In addition to re-issuing cards for customers who actually had fraudulent transactions, the Hinton branch identified Jarrell's Exxon to the main bank office and obtained a list of accounts

3

that had transactions at Jarrell's within a certain time period.[2] The bank then re-issued cards to all of those customers, as well.

The bank employees deny informing any customers of the results of their investigation. They assert that they simply advised customers to use cash or checks, particularly at gas stations, until the issue was resolved. They also deny calling the police and naming Jarrell's as the source of the fraud, although they admit to cooperating with the investigation conducted by Sergeant McMillan of the West Virginia State Police. Sergeant McMillan testified that he received several reports of unauthorized transactions from individuals, but initiated his investigation into Jarrell's after a call from an employee at First Community Bank. Jerry Kessler testified that he learned of the potential issue when Heidi Richmond, the head teller at First Community Bank, called to inform him of the card fraud and the bank's conclusion that his station was the source. He inspected the pumps, but found nothing. Not long thereafter, Sgt. McMillan and another officer visited Jarrell's. They also inspected the pumps and found nothing. Sgt. McMillan believed the fraud might be connected to a series of skimming incidents throughout the state. He relied on First Community Bank's assessment of Jarrell's as the source, and explained, as did the bank employees, that fraudulent transactions often begin appearing weeks or months after the skimming devices have been removed. No one was ever arrested or charged in relation to the alleged skimmers or the fraudulent transactions.

Rumors began spreading that Jarrell's Exxon was skimming card information, and customers at Jarrell's mentioned their concerns to the Kesslers and to the gas attendants. Jerry

---

2 The bank employees do not clearly recall the time period they reviewed and considered in reaching their conclusions and in identifying potentially compromised accounts. No one had a clear recollection, and estimates ranged from several weeks to several months of accounts records prior to late July, when the unauthorized transactions began.

4

Kessler called Heidi Richmond and asked that she refrain from telling people that Jarrell's was skimming cards. He testified that she refused and suggested doing so would require lying to her customers. She does not recall the telephone conversation with Jerry Kessler, but does recall Joe Kessler coming to the bank to demand that employees stop accusing Jarrell's of skimming cards. She testified that it was an angry conversation, with customers in the lobby. Joe Kessler testified that he was calm and polite, and no customers were present. The bank employees suggest that customers themselves came to the conclusion that Jarrell's Exxon was the source of the skimming, pointing to certain customers who use their cards only to purchase gas at Jarrell's. One witness testified that she had unauthorized transactions on an Exxon credit card that she used exclusively at Jarrell's. Other customers of both Jarrell's and First Community Bank testified that bank employees told them that there were skimmers on the pumps at Jarrell's and advised them specifically not to use their cards at Jarrell's. Those customers also testified that they did not view the bank employees' statements as an accusation against Jarrell's or its employees, but as an effort to protect the bank and its customers from fraud. One customer testified that his card was cancelled without notice, although there were no unauthorized transactions, and a bank employee told him that it was cancelled because he had used it at Jarrell's.

    Gas station attendants showed the Kesslers social media posts from community members who assumed that employees at Jarrell's were themselves stealing the card information. Joe Kessler wrote a letter to the editor in an effort to defend the business' reputation. The local paper in Hinton declined to publish the letter, and the Beckley Register Herald opted to write a full story, rather than publishing the letter. The story notes that no skimmers were found at Jarrell's, and

Sandra Cozort Presley is quoted saying that businesses are also victims of skimmers, and she would continue to purchase gas from Jarrell's.

Joe and Jerry Kessler both testified that the business suffered a significant decline as soon as the rumors began. Other employees at Jarrell's also noticed a reduction in gas sales. The Kesslers testified that the business has never fully recovered. Jerry Kessler also testified about damage to his personal reputation. Given the small community in Hinton, he felt that people viewed him differently and he suffered from the stigma of his community believing he was not honest or trustworthy.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*,

477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

First Community Bank moves for summary judgment as to each count of the Plaintiffs' complaint. The Plaintiffs alleged the following causes of action: (1) tortious interference with

7

business interests; (2) defamation and slander; (3) defamation per se; (4) tort of false light invasion of privacy; (5) tort of outrage; and (6) negligence.

### A. *Tortious Interference*

First Community Bank argues that it made no false, derogatory allegations against Jarrell's. It asserts that all of its contact with customers regarding the credit card fraud was designed to protect both the bank and the customers from fraud, not to harm Jarrell's or interfere with its business. It emphasizes that there is no evidence that the bank or its employees had any motivation to interfere with or harm Jarrell's Exxon or Jerry Kessler, and there is no evidence of specific customers refusing to shop at Jarrell's because of statements made by bank employees. The Plaintiffs respond that they have produced evidence of damages, and that there is sufficient evidence to permit a jury to find that the bank's allegations against Jarrell's were not necessary to protect its interests or the interests of its customers. Given that bank employees testified that skimmers would typically be removed by the time fraudulent charges began, Jarrell's argues that the bank had no reason to identify a possible source of the compromised cards.

The West Virginia Supreme Court of Appeals has established the following elements of a prima facie case of tortious interference:

(1) existence of a contractual or business relationship or expectancy;
(2) an intentional act of interference by a party outside that relationship or expectancy;
(3) proof that the interference caused the harm sustained; and
(4) damages.

Syl. Pt. 2, *Torbett v. Wheeling Dollar Sav. & Tr. Co.*, 314 S.E.2d 166, 167 (W. Va. 1983). The Court further held that "[i]f a plaintiff makes a prima facie case, a defendant may prove justification or privilege" as affirmative defenses. *Id*.

> Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

*Id.*

The Plaintiffs have put forth evidence that they suffered a reduction in expected ongoing business as a result of the rumors that credit and debit card information was being compromised at Jarrell's Exxon. They have also presented evidence that employees at First Community Bank informed customers that cards were compromised at Jarrell's, advised them not to use cards at Jarrell's, cancelled cards that had been used at Jarrell's and told customers that cards were cancelled because of use at Jarrell's. The Kesslers, Jarrell's employees, and the Plaintiffs' expert all agree that Jarrell's experienced a reduction in business that coincided with First Community Bank's actions and continued thereafter. Thus, the Court finds that Jarrell's has put forth facts that would permit a jury to find that it has established a prima facie case of tortious interference.

First Community Bank asserts that its communications and actions were privileged because it believed that Jarrell's was, in fact, the source of the card compromises, and it was necessary to warn customers in order to protect both customers and the bank from fraudulent transactions. However, the bank appears to argue both that it did not identify Jarrell's to customers, and that identifying Jarrell's to customers was necessary to prevent ongoing fraud. Clearly, those arguments cannot be easily reconciled. The parties and witnesses appear to be in agreement that card skimmers would ordinarily be removed before fraudulent transactions begin to take place. There is evidence that both Jerry Kessler and Sgt. McMillan informed the bank employees that there were no skimmers on the pumps at Jarrell's when the bank was receiving the fraud

9

complaints. Thus, a jury could reasonably reject a privilege defense. Therefore, the Court finds that the Defendant's motion for summary judgment as to Count One should be denied.

### B. *Defamation, Defamation per se, and Slander*

First Community Bank next asserts that it is entitled to summary judgment as to the Plaintiffs' claims in Counts Two and Three, brought on behalf of Jarrell's Exxon and Jerry Kessler personally. It asserts that there is no evidence that it made false or defamatory statements. It further asserts that "the conversations FCB had with its customers were conversations with third parties who had the right to know how they had been victimized and how to protect themselves from further fraud in the future." (Def.'s Mem. at 11.) The Plaintiffs argue that both truth and privilege are elements of a defense for which the Defendant bears the burden of proof. The Plaintiffs assert that "[t]here is conflicting evidence regarding what statements were made, the bases for the statements, the truth or falsity of the statements, the extent of investigation undertaken to determine the truth or falsity of the statements, the knowledge of potential falsity possessed by the bank, and the validity of any argued privilege or justification for the statements." (Pl.s' Resp. at 12.)

In West Virginia, the elements of a defamation claim are: "(1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. Pt. 1, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 74 (W. Va. 1983). "[I]n the absence of a privileged communication, the standard is one of negligence, and the conduct of the defendant is to be measured against what a reasonably prudent person would have done under the same or similar circumstances." *Id.*, Syl. Pt. 2. "Defamation may be accomplished through inference, implication, innuendo or insinuation, as well as through direct reference." *Id.*, Syl. Pt. 4. "At common law, defamation per se includes only imputations of a crime of moral turpitude, imputations of a loathsome disease, imputations of

sexual misconduct by a woman, and imputations which affect a business, trade, profession or office." *Mauck v. City of Martinsburg*, 280 S.E.2d 216, 220, f.n. 3 (W. Va. 1981) (citing Restatement (Second) of Torts ss 571-74 (1977)). Further, "slander and libel are treated together as a claim for defamation under West Virginia law." *Workman v. Kroger Ltd. P'ship I*, No. CIV.A. 5:06-CV-00446, 2007 WL 2984698, at *4 (S.D.W. Va. Oct. 11, 2007) (Johnston, J.)

The parties appear to have assumed that the defamation claims as to Jerry Kessler and Jarrell's Exxon should be evaluated under the standard applicable to private figures, and the Court will likewise apply that standard. The Plaintiffs have presented evidence that employees of First Community Bank told its customers that there were skimmers on the gas pumps at Jarrell's Exxon and/or that Jarrell's Exxon was the source of card compromises that led to fraudulent transactions. Those statements clearly reference Jarrell's Exxon. A jury could find those statements to be defamatory as to both Jarrell's Exxon and as to Jerry Kessler as the sole owner of Jarrell's, and those statements may be considered per-se defamation. As discussed above, a jury could reject the claim of privilege, given the evidence that no skimmers were on the pumps at the time of the defamatory statements. The Court finds that factual disputes remain regarding whether the statements were true or false.[3] In addition to those factual disputes, a jury could find the statements misleading in that they imply that skimmers remained on the pumps, that cards may

---

3 The Court notes that there is a motion *in limine* regarding the admissibility of any testimony related to the bank's purported investigation, given that the tellers' testimony was not entirely consistent and the documents and information underlying the conclusions is not available. The Court will not rule on that motion at this time, as factual disputes exist whether that evidence is admitted or not. A witness testified that she had unauthorized transactions on Exxon credit cards used exclusively at Jarrell's, which tends to support the conclusion that there were skimmers on the pumps at Jarrell's at some point. Employees at Jarrell's testified that they did not see anything unusual on the pumps, and Jerry Kessler testified that he inspected the pumps regularly and had never seen skimmers, which would tend to support the conclusion that there were not skimmers on the pumps.

continue to be compromised if used at Jarrell's, or that someone at Jarrell's was responsible for the fraud.

Viewed in the light most favorable to the Plaintiffs, and resolving factual conflicts in the Plaintiffs' favor, the bank tellers conducted their own investigation with little, if any, training in isolating a source of compromised cards. On the basis of that investigation, they decided that card information was obtained by a third party via skimmers on gas pumps at Jarrell's Exxon. Although employees and executives at First Community Bank testified that skimmers are generally removed before fraudulent transactions begin, employees in the Hinton branch began telling customers that card compromises were caused by skimmers at Jarrell's Exxon and advising people not to use their cards at Jarrell's. A jury could conclude that First Community Bank was negligent in disseminating those statements and rumors. Finally, as found above, the Plaintiffs have produced evidence of a decline in business. Jerry Kessler also testified that he personally experienced significant stress as a result of both the financial difficulty and the harm to his own reputation. Therefore, a jury that credits the Plaintiffs' evidence could conclude that First Community Bank made defamatory statements. Thus, the motion for summary judgment should be denied as to Counts Two and Three.

### C. Tort of False Light Invasion of Privacy

First Community Bank argues that it did not publicize false information about Jarrell's Exxon or Jerry Kessler, and certainly did not know any information it shared was false. It further argues that any statements made by its employees were not widely publicized, with the exception of Sandra Cozort Presley's statement to the Beckley Register Herald, which was generally

12

supportive of Jarrell's. The Plaintiffs argue that there is sufficient evidence to support a jury verdict in their favor.

The West Virginia Supreme Court of Appeals has established that "[p]ublicity which unreasonably places another in a false light before the public is an actionable invasion of privacy." Syl. Pt. 12, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 74 (W. Va. 1983). A plaintiff must show that "the false light in which [he] was placed would be highly offensive to a reasonable person" and "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Giles v. Kanawha Cty. Bd. of Educ.*, No. 17-0139, 2018 WL 300605, at *4 (W. Va. Jan. 5, 2018) (unpublished) (citing *Restatement (Second) of Torts* § 652E (1977). Further, the matter must be the subject of widespread publicity. *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 873, 887 (S.D.W. Va. 2014) (Copenhaver, J.)

As discussed above, a jury could find the bank employees' statements to be misleading, false, and/or reckless, as well as highly offensive. Whether they were the subject of widespread publicity is a closer question. At most, a jury could infer that the bank employees shared their conclusion that there were skimmers at Jarrell's with the impacted customers—in other words, all customers that Jarrell's and First Community Bank had in common. The exact number is not clear, but there was testimony that more than 100 cards were cancelled as a result of the bank's decision to cancel cards that had been used at Jarrell's. Although there was a newspaper article about the subject, that article was instigated by Joe Kessler. The quote from Ms. Cozort Presley did not directly address the allegation that there were skimmers at Jarrell's, and was generally supportive of Jarrell's. There was discussion on social media of the accusations that Jarrell's had

13

skimmers or that card fraud could be traced back to Jarrell's, but there is no evidence that bank employees participated in those discussions. A jury might, however, infer that bank employees were the original source of some of the content and allegations shared by others. Given the factual disputes between the parties and the potential inferences that could be drawn, the Court finds that the Defendant has not demonstrated that there is no material dispute of fact regarding Count Four. Therefore, the motion for summary judgment on the claim for false light invasion of privacy should also be denied.

### D. Tort of Outrage

First Community Bank moves for summary judgment with respect to the Plaintiffs' claim for the tort of outrage. It emphasizes that even conduct that constitutes another tort does not support an outrage claim unless it is particularly extreme and outrageous. The Plaintiffs argue that a reasonable jury could conclude that the Defendants' conduct was extreme and outrageous based on their decision to publicize the results of an amateur investigation, conducted without detailed training or an official policy, and the fact that the file of the investigation was subsequently destroyed.

The West Virginia Supreme Court has established the following elements for outrage claims, also called intentional infliction of emotional distress:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

14

Syl. pt. 3, *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 421 (W. Va. 1998) (reaffirmed in *Hatfield v. Health Mgmt. Associates of W. Virginia*, 672 S.E.2d 395, 404 (W. Va. 2008).

Telling customers that Jarrell's had skimmers on gas pumps, based on an insufficient investigation and with the knowledge that any skimmers would likely be gone by the time the bank and customers began noticing fraudulent transactions, is not conduct to be encouraged or excused. However, an outrage claim demands more extreme conduct than that required to support an underlying or related tort claim. The Court finds that the Plaintiffs have not produced evidence to support a conclusion that the Defendant's conduct was "so extreme and outrageous as to exceed the bounds of decency." Therefore, the motion for summary judgment as to Count Five should be granted.

### E. Negligence

The bank also seeks summary judgment as to the Plaintiffs' negligence claim. It argues that it did not owe Jarrell's a duty, and that its actions were undertaken in an effort to appropriately discharge the duty it did owe to its customers. The Plaintiffs argue that there was a duty because the harm to Jarrell's and Jerry Kessler was the foreseeable result of First Community Bank's actions. They emphasize that First Community Bank had no policies or training regarding whether or how employees should conduct investigations of potential fraud and whether or how to publicize any findings following any investigation.

"In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken." Syl. Pt. 3, *Aikens v. Debow*,

15

541 S.E.2d 576, 578 (W. Va. 2000) (internal quotation marks and citations omitted). The West Virginia Supreme Court has held:

> The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

*Strahin v. Cleavenger*, 603 S.E.2d 197, 201 (W. Va. 2004). "The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law." Syl. Pt. 5, *Aikens*, 541 S.E.2d at 578.

In *Aikens*, the West Virginia Supreme Court found that a business could not recover for economic losses resulting from a driver's negligence that led to an accident that damaged a bridge necessary to reach the business premises. The court provided a detailed analysis of the extent of duty in cases with "an element of remoteness between the injury and the act of negligence." *Id*. at 584. Ultimately, the court found the such economic injuries are not recoverable unless there is "physical harm to that individual's person or property, a contractual relationship with the alleged tortfeasor, or some other special relationship…sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor." *Id*. at 589. "The existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general." *Id*. "Such special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable claim and can

16

arise from contractual privity or other close nexus." *Id.* The court approvingly cited cases finding a special relationship or duty even absent any contractual relationship.

Unlike cases in which a plaintiff's damages result from the ripple effects of a negligent act, like a car accident that causes a road closure, the bank's actions here directly targeted the Plaintiffs. Viewing the evidence in the light most favorable to the Plaintiffs, the bank specifically informed customers that Jarrell's was the source of a breach of their card information. It was eminently foreseeable that Jarrell's would be harmed by those statements. Thus, the Court finds that the bank owed Jarrell's a duty of care under these circumstances.

The Court has previously addressed the Defendant's arguments that it was appropriate and necessary to tell customers that Jarrell's was the source of the breach in order to protect against future fraud. There are factual disputes regarding whether there was ever a skimmer at Jarrell's, and there is little evidence that there was any reason to believe that there was a risk to card security at the time the bank employees told consumers that Jarrell's was the source of the breach. A reasonable jury could conclude that First Community Bank's handling of the increase in fraud at the Hinton branch, the investigation, and the communications with customers was negligent, and that negligence damaged the Plaintiffs. Accordingly, the Court finds that summary judgment is not appropriate as to Count Six.

### F. Punitive Damages

Finally, the Defendant argues that it is entitled to judgment as a matter of law precluding any punitive damages because there is no evidence that it acted with malice. The Plaintiffs argue that the bank's conduct was at least reckless.

The Court finds that the Plaintiffs have produced sufficient facts to permit a jury, viewing those facts and inferences in the light most favorable to the Plaintiffs, to impose punitive damages. Therefore, the motion for summary judgment as to punitive damages is denied at this stage.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Defendants' Motion for Summary Judgment* (Document 99) be **GRANTED** as to Count Five and **DENIED** as to all remaining counts.

The Court observed that the parties conducted mediation on December 20, 2017. Given the development of the case since that date, the Court **ORDERS** that the parties engage in an additional mediation session prior to the pretrial conference. Should the parties wish to use the services of a United States Magistrate Judge as a mediator, they may file a motion requesting such a referral.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: June 26, 2018

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA